# EXHIBIT A

> CONTRACT OF SALE--OFFICE, COMMERCIAL AND MULTI-FAMILY RESIDENTIAL PREMISES (2000)
> This form was prepared by the Committee on Real Property Law of the Association of the Bar of the City of
> New York. To view an introduction to the form, visit the Real Estate Law page at www.abcny.org.

# Contract of Sale—Office, Commercial and Multi-Family Residential Premises

### between

1551 St. Nicholas LLC, c/o New Realty Management, Inc.
450 Seventh Ave
New York, New York  10123-0101          ("Seller")

### and

Real Estate Services,
Milbank ~~Realty Service~~, Inc.
8 Ferguson Street
Los Angeles, CA          ("Purchaser")

dated FEBRUARY 22, 2007

### Premises:

| | |
|---|---|
| Street Address: | 1551 St. Nicholas Ave |
| City or Town: | New York |
| County: | New York |
| State: | New York |

# Table of Contents

| | | |
|---|---|---|
| Section 1. | Sale of Premises and Acceptable Title | 1 |
| Section 2. | Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons | 1 |
| Section 3. | The Closing | 3 |
| Section 4. | Representations and Warranties of Seller | 3 |
| Section 5. | Acknowledgments, Representations and Warranties of Purchaser | 5 |
| Section 6. | Seller's Obligations as to Leases | 6 |
| Section 7. | Responsibility for Violations | 7 |
| Section 8. | Destruction, Damage or Condemnation | 7 |
| Section 9. | Covenants of Seller | 7 |
| Section 10. | Seller's Closing Obligations | 8 |
| Section 11. | Purchaser's Closing Obligations | 9 |
| Section 12. | Apportionments | 9 |
| Section 13. | Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien | 10 |
| Section 14. | Broker | 11 |
| Section 15. | Notices | 11 |
| Section 16. | Limitations on Survival of Representations, Warranties, Covenants and other Obligations | 11 |
| Section 17. | Due Diligence Period | 11 |
| Section 18. | Miscellaneous Provisions | 12 |
| Schedule A. | Description of Premises | 13 |
| Schedule B. | Permitted Exceptions | 14 |
| Schedule C. | Purchase Price | 15 |
| Schedule D. | Miscellaneous | 16 |
| Schedule E. | Rent Schedule | 17 |

© 2004 Matthew Bender & Co., a member of the LexisNexis Group.

# Contract of Sale—Office, Commercial and Multi-Family Residential Premises

CONTRACT dated _____ between _____ **1551 St. Nicholas LLC** _____

("Seller") and _____ ~~Milbank Realty Service, Inc.~~ _____ ("Purchaser").
         *Real Estate Services,*

Seller and Purchaser hereby covenant and agree as follows:

## Section 1.   Sale of Premises and Acceptable Title

§1.01   Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract: (a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building; and (e) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, "Premises"). For purposes of this contract, "appurtenances" shall include all right, title and interest of Seller in and to (i) the leases for space in the Building, and all guarantees thereof, as shown on Schedule E attached hereto and any leases entered into by Seller between the date of this contract and the Closing (as hereinafter defined); (ii) the Service Contracts (as hereinafter defined); (iii) plans, specifications, architectural and engineering drawings, prints, surveys, soil and substrata studies relating to the Land and the Building in Seller's possession; (iv) all operating manuals and books, data and records regarding the Land and the Building and its component systems in Seller's possession; (v) all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Land and the Building to the extent that they may be transferred or assigned; (vi) all warranties or guaranties, if any, applicable to the Building, to the extent such warranties or guaranties are assignable; and (vii) all tradenames, trademarks, servicemarks, logos, copyrights and good will relating to or used in connection with the operation of the Land and the Building. The Premises are located at or known as _____
**1551 St. Nicholas Ave, New York, New York 10040**

§1.02.   Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to: (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and (b) such other matters as (i) the title insurer specified in Schedule D attached hereto (or if none is so specified, then any title insurer licensed to do business by the State of New York) shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises and (ii) shall be accepted by any lender described in Section 274-a of the Real Property Law ("Institutional Lender") which has committed in writing to provide mortgage financing to Purchaser for the purchase of the Premises ("Purchaser's Institutional Lender"), except that if such acceptance by Purchaser's Institutional Lender is unreasonably withheld or delayed, such acceptance shall be deemed to have been given.

## Section 2.   Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons

§2.01.   The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Premises as provided in Schedule C attached hereto is $ **9,000,000.00**

§2.02.   All monies payable under this contract, unless otherwise specified in this contract, shall be paid by (a) certified checks of Purchaser or any person making a purchase money loan to Purchaser drawn on any bank or trust company having a banking office in the City of New York and which is a member of the New York Clearing House Association or (b) official bank checks drawn by any such banking institution, payable to the order of Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of one-half of one percent of the Purchase Price shall be acceptable for sums payable to Seller at the Closing, or (c) with respect to the portion of the Purchase Price payable at the Closing, at Seller's election, by wire transfer of immediately available federal funds to an account designated by Seller not less than three business days prior to the Closing.

§2.03.   ~~(a) If Schedule C provides for the acceptance of title by Purchaser subject to one or more existing mortgages (collectively, "Existing Mortgage(s)"), the amounts specified in Schedule C with reference thereto may be approximate. If at the Closing the aggregate principal amount of the Existing Mortgage(s), as reduced by payments required thereunder prior to the Closing, is less than the aggregate amount of the Existing Mortgage(s) as specified in Schedule C, the difference shall be added to the monies payable at the Closing, unless otherwise expressly provided herein.~~

1                    © 2004 Matthew Bender & Co., a member of the LexisNexis Group.

(b) If any of the documents constituting the Existing Mortgage(s) or the note(s) secured thereby prohibits or restricts the conveyance of the Premises or any part thereof without the prior consent of the holder or holders thereof ("Mortgagee(s)") or confers upon the Mortgagee(s) the right to accelerate payment of the indebtedness or to change the terms of the Existing Mortgage(s) in the event that a conveyance is made without consent of the Mortgagee(s), Seller shall notify such Mortgagee(s) of the proposed conveyance to Purchaser within 10 days after execution and delivery of this contract, requesting the consent of such Mortgagee(s) thereto. Seller and Purchaser shall furnish the Mortgagee(s) with such information as may reasonably be required in connection with such request and shall otherwise cooperate with such Mortgagee(s) and with each other in an effort expeditiously to procure such consent, but neither shall be obligated to make any payment to obtain such consent. If such Mortgagee(s) shall fail or refuse to grant such consent in writing on or before the date set forth in Schedule D or shall require as a condition of the granting of such consent (i) that additional consideration be paid to the Mortgagee(s) and neither Seller nor Purchaser is willing to pay such additional consideration or (ii) that the terms of the Existing Mortgage(s) be changed and Purchaser is unwilling to accept such change, then unless Seller and Purchaser mutually agree to extend such date or otherwise modify the terms of this contract, Purchaser may terminate this contract in the manner provided in §13.02. If Schedule C provides for a Purchase Money Mortgage (as defined in §2.04), Seller may also terminate this contract in the manner provided in §13.02 if any of the foregoing circumstances occur or if Seller is unwilling to accept any such change in the terms of the Existing Mortgage(s).

§2.04    (a)  If Schedule C provides for payment of a portion of the Purchase Price by execution and delivery to Seller of a note secured by a purchase money mortgage ("Purchase Money Mortgage"), such note and Purchase Money Mortgage shall be drawn by the attorney for the Seller on the most recent forms of the New York Board of Title Underwriters (or its successor) for notes and for mortgages of like lien, as modified by this contract. At the Closing, Purchaser shall pay the mortgage recording tax and recording fees therefor and the filing fees for any financing statements delivered in connection therewith.

(b)  If Schedule C provides for the acceptance of title by Purchaser subject to _____ Existing Mortgage(s) prior in lien to the Purchase Money Mortgage, the Purchase Money Mortgage shall provide that it is subject and subordinate to the lien(s) of the Existing Mortgage(s) and shall be subject and subordinate to any extensions, modifications, renewals, consolidations, substitutions or replacements thereof (collectively, "Refinancing" or "Refinanced Mortgage"), provided that (i) the _____ rate of interest payable under a Refinanced Mortgage shall not be greater than that specified in Schedule D as the Maximum Interest Rate or, if no Maximum Interest Rate is specified in Schedule D, shall not be greater than the _____ rate of interest that was payable on the refinanced indebtedness immediately prior to such Refinancing; and (ii) if the principal amount of the Refinanced Mortgage plus the principal amount of other Existing Mortgage(s), if any, remaining after placement of a Refinanced Mortgage exceeds the amount of principal owing and unpaid on all mortgages on the Premises superior to the Purchase Money Mortgage immediately prior to the Refinancing, an amount equal to the excess shall be paid at the closing of the Refinancing to the holder of the Purchase Money Mortgage in reduction of principal payments due thereunder in inverse order of maturity. The Purchase Money Mortgage shall further provide that the holder thereof shall, on demand and without charge therefor, execute, acknowledge and deliver any agreement or agreements reasonably required by the mortgagor to confirm such subordination.

(c)  The Purchase Money Mortgage shall contain the following additional provisions: _____

(i)  "The mortgagor or any owner of the mortgaged premises shall have the right to prepay the entire unpaid indebtedness together with accrued interest, but without penalty, at any time on or after [insert day following the last day of the fiscal year of the mortgagee in which the Closing occurs or, if a Prepayment Date is specified in Schedule D, the specified Prepayment Date], on not less than 10 days' written notice to the holder hereof."

(ii)  "Notwithstanding anything to the contrary contained herein, the obligation of the mortgagor for the payment of the indebtedness and for the performance of the terms, covenants and conditions contained herein and in the note secured hereby is limited solely to recourse against the property secured by this mortgage, and in no event shall the mortgagor or any principal of the mortgagor, disclosed or undisclosed, be personally liable for any breach of or default under the note or this mortgage or for any deficiency resulting from or through any proceedings to foreclose this mortgage, nor shall any deficiency judgment, money judgment or other personal judgment be sought or entered against the mortgagor or any principal of the mortgagor, disclosed or undisclosed, but the foregoing shall not adversely affect the lien of this mortgage or the mortgagee's right of foreclosure."

(iii)  "In addition to performing its obligations under Section 274-a of the Real Property Law, the mortgagee, if other than one of the institutions listed in Section 274-a, agrees that, within 10 days after written request by the mortgagor, but not more than twice during any period of 12 consecutive months, it will execute, acknowledge and deliver without charge a certificate of reduction in recordable form (a) certifying as to (1) the then unpaid principal balance of the indebtedness secured hereby, (2) the maturity date thereof, (3) the rate of interest, (4) the last date to which interest has been paid and (5) the amount of any escrow deposits then held by the mortgagee, and (b) stating, to the knowledge of the mortgagee, whether there are any alleged defaults hereunder and, if so, specifying the nature thereof."

(iv)  "All notices required or desired to be given under this mortgage shall be in writing and shall be delivered personally or shall be sent by prepaid registered or certified mail, addressed to the mortgagor and mortgagee at the addresses specified in this mortgage or to such other parties or at such other addresses, not exceeding two, as may be designated in a notice given to the other party or parties in accordance with the provisions hereof."

(v)  The additional provisions, if any, specified in a rider hereto.

§2.05.    (a)  If the sum paid under paragraph (a) of Schedule C or any other sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") are paid by check or checks drawn to the order of and delivered to Seller's attorney or another escrow agent ("Escrowee"), the Escrowee shall hold the proceeds thereof in escrow in a special bank account (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee need not hold such proceeds in an interest-bearing account, but if any interest is earned thereon, such interest shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are either set forth in Schedule D or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrow shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10 day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this contract or a final judgment of a court. However, Escrow shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)  The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c)  Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

(d)  If Escrowee is Seller's attorney, Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(e)  Escrowee may act or refrain from acting in respect of any matter referred to in this §2.05 in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

§2.06.    In the event that Seller is a "foreign person", as defined in Internal Revenue Code Section 1445 and regulations issued thereunder (collectively, the "Code Withholding Section"), or in the event that Seller fails to deliver the certification of non-foreign status required under §10.12(c), or in the event that Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price a sum equal to ten percent (10%) thereof and shall at Closing remit the withheld amount with Forms 8288 and 8288A or any successors thereto) to the Internal Revenue Service; and if the cash balance of the Purchase Price payable to Seller at the Closing after deduction of net adjustments, apportionments and credits (if any) to be made or allowed in favor of Seller at the Closing as herein provided is less than ten percent (10%) of the Purchase Price, Purchaser shall have the right to terminate this contract, in which event Seller shall refund the Downpayment to Purchaser and shall reimburse Purchaser for title examination and survey costs as if this contract were terminated pursuant to §13.02. The right of termination provided for in this §2.06 shall be in addition to and not in limitation of any other rights or remedies available to Purchaser under applicable law.

## Section 3.    The Closing

§3.01.    Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D.

## Section 4.    Representations and Warranties of Seller

Seller represents and warrants to Purchaser as follows:

§4.01.    Unless otherwise provided in this contract, Seller is the sole owner of the Premises.

§4.02.    If the Premises are encumbered by an Existing Mortgage(s), no written notice has been received from the Mortgagee(s) asserting that a default or breach exists thereunder which remains uncured and no such notice shall have been received and remain uncured on the Closing Date. If copies of documents constituting the Existing Mortgage(s) and note(s) secured thereby have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals and the Existing Mortgage(s) and note(s) secured thereby have not been modified or amended except as shown in such documents.

§4.03.   The information concerning written leases (which together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies in the Premises not arising out of the Leases (collectively, "Tenancies") set forth in Schedule E attached hereto ("Rent Schedule") is _____substantially_____ accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Premises other than those set forth therein and any subleases or subtenancies. Except as otherwise set forth in the Rent Schedule or elsewhere in this contract:

(a)   all of the Leases are in full force and effect and none of them has been modified, amended or extended;

(b)   no renewal or extension option or options for additional space have been granted to tenants;

(c)   no tenant has an option to purchase the Premises or a right of first refusal or first offer with respect to a sale of the Premises; ^ or third party

(d)   the rents set forth are being collected on a current basis and there are no arrearages in excess of one month;

(e)   no tenant is entitled to rental concessions or abatements for any period subsequent to the scheduled date of closing;

(f)   Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured;

(g)   no action or proceeding instituted against Seller by any tenant of the Premises is presently pending in any court, except with respect to claims involving personal injury or property damage which are covered by insurance;

(h)   there are no security deposits other than those set forth in the Rent Schedule;

(i)   true and complete copies of the Leases have been delivered to Purchaser or its counsel and initialed by representatives of Purchaser and Seller;

(j)   the tenants under the Leases are in actual possession of the space demised;

(k)   Seller has performed all of the landlord's obligations under the Leases and no notice of any default of the landlord under the Leases has been given or to the knowledge of Seller is pending;

(l)   to the best of Seller's knowledge, no action or proceeding, voluntary or involuntary, is pending against any tenant under any bankruptcy or insolvency act; and

(m)   no leasing commissions are due or owing with respect to any of the Leases.

If any Leases which have been exhibited to and initialed by Purchaser or its representative contain provisions that are inconsistent with the foregoing representations and warranties, such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to the provisions of the Leases.

§4.04.   ~~If the Premises or any part thereof are subject to the New York City Rent Stabilization Law, Seller is and on the Closing Date will be a member in good standing of the Real Estate Industry Stabilization Association, and, except as otherwise forth in the Rent Schedule, there are no proceedings with any tenant presently pending before the Conciliation and Appeals Board or the New York State Division of Housing and Community Renewal in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders of the Conciliation and Appeals Board or the New York State Division of Housing and Community Renewal that have not been complied with by Seller.~~

§4.05.   ~~If the Premises or any part thereof are subject to the New York City Emergency Rent and Rehabilitation Law, the rents shown are not in excess of the maximum collectible rents, and, except as otherwise set forth in the Rent Schedule, no tenants are entitled to abatements as senior citizens, there are no proceedings presently pending in which a tenant has alleged an overcharge of rent or diminution of services or similar grievance, and there are no outstanding orders that have not been complied with by Seller.~~

§4.06.   If an insurance schedule is attached hereto, such schedule lists all insurance policies presently affording coverage with respect to the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.07.   If a payroll schedule is attached hereto, such schedule lists all employees presently employed at the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and, except as otherwise set forth in such schedule, none of such employees is covered by a union contract and there are no retroactive increases or other accrued and unpaid sums owed to any employee.

§4.08.   If a schedule of service, maintenance, supply and management contracts ("Service Contracts") is attached hereto, such schedule lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.09. If a copy of a certificate of occupancy for the Premises has been exhibited to and initialed by Purchaser or its representative, such copy is a true copy of the original and such certificate has not been amended, but Seller makes no representation as to compliance with any such certificate.

§4.10. The assessed valuation and real estate taxes set forth in Schedule D, if any, are the assessed valuation of the Premises and the taxes paid or payable with respect thereto for the fiscal year indicated in such schedule. Except as otherwise set forth in Schedule D, there are no tax abatements or exemptions affecting the Premises.

§4.11. Except as otherwise set forth in a schedule attached hereto, if any, if the Premises are used for residential purposes, each apartment contains a range and a refrigerator, and all of the ranges and refrigerators and all of the items of personal property (or replacements thereof) listed in such schedule, if any, are and on the Closing Date will be owned by Seller free of liens and encumbrances other than the lien(s) of the Existing Mortgage(s), if any.

§4.12. Seller has no actual knowledge that any incinerator, boiler or other burning equipment on the Premises is being operated in violation of applicable law. If copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.13. Except as otherwise set forth in Schedule D, Seller has no actual knowledge of any assessment payable in annual installments, or any part thereof, which has become a lien on the Premises.

§4.14. Seller is not a "foreign person" as defined in the Code Withholding Section.

§4.15. Seller is a <u>limited liability corporation</u> that has been duly organized and is validly and presently existing in good standing under the laws of the state of its formation.

§4.16. Seller has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and consummate the transaction contemplated hereby. Assuming due authorization, execution and delivery by each other party hereto, this contract and all obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

§4.17. The execution and delivery of this contract and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any of Seller's assets or property which would materially and adversely affect the ability of Seller to carry out the terms of this contract. Seller has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery or performance by Seller of this contract.

§4.18. There are no pending proceedings or appeals to correct or reduce the assessed valuation of the Premises.

For purposes of this Section, the phrase "to Seller's knowledge" shall mean the actual knowledge of _____<u>Seller</u>_____ without any special investigation.

The representations and warranties made by Seller in this contract shall be deemed restated and shall be true and accurate on the Closing Date.

## Section 5.    Acknowledgments, Representations and Warranties of Purchaser

Purchaser acknowledges that:

§5.01. Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §7.01, §8.01, and §9.04, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this contract.

§5.02. Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or orally.

Purchaser represents and warrants to Seller that:

§5.03. The funds comprising the Purchase Price to be delivered to Seller in accordance with this contract are not derived from any illegal activity.

5

§5.04.  Purchaser has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and the transaction contemplated hereby. Assuming due authorization, execution and delivery by each other party hereto, this contract and all obligations of Purchaser hereunder are the legal, valid and binding obligations of Purchaser, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

§5.05.  The execution and delivery of this contract and the performance of its obligations hereunder by Purchaser will not conflict with any provision of any law or regulation to which Purchaser is subject or any agreement or instrument to which Purchaser is a party or by which it is bound or any order or decree applicable to Purchaser or result in the creation or imposition of any lien on any of Purchaser's assets or property which would materially and adversely affect the ability of Purchaser to carry out the terms of this contract. Purchaser has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery or performance by Purchaser of this contract.

## Section 6.    Seller's Obligations as to Leases

§6.01.  Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld: (a) amend, renew or extend any Lease in any respect, unless required by law; (b) grant a written lease to any tenant occupying space pursuant to a Tenancy; or (c) terminate any lease or Tenancy except by reason of a default by the tenant thereunder. but in such case of renewal required by law, such renewal shall be at legal maximum rent.

together with tenant's application and credit report

§6.02.  Unless otherwise provided in a schedule attached to this contract, between the date of this contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant without first giving Purchaser written notice of the identity of the proposed tenant, together with (a) either a copy of the proposed lease or a summary of the terms thereof in reasonable detail and (b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof. If Purchaser objects to such proposed lease, Purchaser shall so notify Seller within 4 business days after receipt of Seller's notice if such notice was personally delivered to Purchaser, or within 7 business days after the mailing of such notice by Seller to Purchaser, in which case Seller shall not enter into the proposed lease. Unless otherwise provided in a schedule attached to this contract, Purchaser shall pay to Seller at the Closing, in the manner specified in §2.02, the rent and additional rent that would have been payable under the proposed lease from the date on which the tenant's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less the amount of the brokerage commission specified in Seller's notice and the reasonable cost of decoration or other work required to be performed by the landlord under the terms of the proposed lease to suit the premises to the tenant's occupancy ("Reletting Expenses"), prorated in each case over the term of the proposed lease and apportioned as of the Closing Date. If Purchaser does not so notify Seller of its objection, Seller shall have the right to enter into the proposed lease with the tenant identified in Seller's notice and ~~Purchaser shall pay to Seller, in the manner specified in §2.03, the Reletting Expenses, prorated in each case over the term of the lease and apportioned as of the later of the Closing Date or the rent commencement date. Such payment shall be made: (b) grant a written lease to any tenant occupying space. In no event shall the amount so payable to Seller exceed the sums actually paid by Seller on account thereof.~~ If Seller is not ready, willing and able to close on Closing Date, subject to reasonable adjournments, Purchaser shall have no further obligation to pay for any future vacancy, after such reasonable adjournment dates.

§6.03.  If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this contract. Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent. Seller shall not apply all or any part of the security deposit of any tenant unless such tenant has vacated the Premises.

§6.04.  Seller does not warrant that any particular Lease or Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

~~§6.05.  Seller hereby indemnifies and agrees to defend Purchaser against any claims made pursuant to §7-107 or §7-108 of the General Obligations Law (the "GOL") by tenants who resided in the Premises on or prior to the Closing Date other than (a) claims with respect to tenants' security deposit paid, credited or assigned to Purchaser pursuant to §10.03, (b) claims made pursuant to §7-107 of the GOL with respect to funds for which Seller was not liable, and (c) claims made pursuant to §7-108 of the GOL by tenants to whom Purchaser failed to give the written notice specified in §7-108(e) of the GOL within thirty days after the Closing Date. The foregoing indemnity and agreement shall survive the Closing and shall be in lieu of any escrow permitted by §7-108(d) of the GOL, and Purchaser hereby waives any right it may have to require any such escrow.~~

Section 7.    Responsibility for Violations

~~§7.01.    Except as provided in §7.02 and §7.03, all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to the date of this contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of _____ , if applicable, shall be removed or complied with by Seller. If such removal or compliance has not been completed prior to the Closing, Seller shall pay to Purchaser at the Closing the reasonably estimated unpaid cost to effect or complete such removal or compliance, and Purchaser shall be required to accept title to the Premises subject thereto, except that Purchaser shall not be required to accept such title and may terminate this contract as provided in §13.02 if (a) Purchaser's Institutional Lender reasonably refuses to provide financing by reason thereof or (b) the Building is a multiple dwelling and either (i) such violation is rent impairing and causes rent to be unrecoverable under Section 302 a of the Multiple Dwelling Law or (ii) a proceeding has been validly commenced by tenants and is pending with respect to such violation for a judgment directing deposit and use of rents under Article 7-A of the Real Property Actions and Proceedings Law. All such notes or notices of violations noted or issued on or after the date of this contract shall be the sole responsibility of Purchaser.~~

~~§7.02.    If the reasonably estimated aggregate cost to remove or comply with any violations or liens which Seller is required to remove or comply with pursuant to the provisions of §7.01 shall exceed the Maximum Amount specified in Schedule D (or if none is so specified, the Maximum Amount shall be one-half of one percent of the Purchase Price), Seller shall have the right to cancel this contract, in which event the sole liability of Seller shall be as set forth in §13.02, unless Purchaser elects to accept title to the Premises subject to all such violations or liens, in which event Purchaser shall be entitled to a credit of an amount equal to the Maximum Amount against the monies payable at the Closing.~~

~~§7.03.    Regardless of whether a violation has been noted or issued prior to the date of this contract, Seller's failure to remove or fully comply with any violations which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy shall not be an objection to title. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price, except that if Purchaser's Institutional Lender reasonably refuses to provide financing by reason of a violation described above, Purchaser shall not be required to accept the Premises subject thereto and Purchaser shall have the right to terminate this contract in the manner provided in §13.02.~~

~~§7.04.    If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.~~
Section 7.01  Notwithstanding anything to the contrary contained herein, Purchaser shall assume the responsibility of removing violations on the Premises prior to Closing except for violations which can be removed by the payment of money only, it being understood that any violations of which there is a monetary obligation for removal shall be the sole responsibility of Seller. Seller shall pay monetary obligations accruing as of the date of the closing under the building code and administrative code. This paragraph shall survive closing of title.

Section 8.    Destruction, Damage or Condemnation

§8.01.    The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this contract.    Seller's liability respecting violations of any nature is expressly limited to those violations that may be removed or settled by the payment of money, it being understood that Purchaser shall become and remain responsible to cure, remove or take any steps necessary respecting non-monetary obligations as of the date of the closing of this Contract.

Section 9.    Covenants of Seller

Seller covenants that between the date of this contract and the Closing: to survive closing

§9.01.    The Existing Mortgage(s) shall not be amended or supplemented or prepaid in whole or in part. Seller shall pay or make, as and when due and payable, all payments of principal and interest and all deposits required to be paid or made under the Existing Mortgage(s).

§9.02.    Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same is terminable without penalty by the then owner of the Premises upon not more than 30 days' notice.

§9.03.    If an insurance schedule is attached hereto, Seller shall maintain in full force and effect until the Closing the insurance policies described in such schedule or renewals thereof for no more than one year of those expiring before the Closing.

§9.04.    No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05.    Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

§9.06.    Seller shall allow Purchaser or Purchaser's representatives access to the Premises, the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

7

Section 10.    Seller's Closing Obligations

At the Closing, Seller shall deliver the following to Purchaser:

§10.01.    A statutory form of bargain And sale deed ~~without~~ <ins>with</ins> covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this contract.

§10.02.    ~~All Leases initialed by Purchaser and all others in Seller's possession.~~ <ins>All original Leases and/or certified copies in Seller's possession.</ins>

§10.03.    A schedule of all security deposits (and, if the Premises contains six or more family dwelling units, the most recent reports with respect thereto issued by each banking organization in which they are deposited pursuant to GOL §7-103) and a check or credit to Purchaser in the amount of any cash security deposits, including any interest thereon, held by Seller on the Closing Date or, if held by an Institutional Lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments of transfer or assignment with respect to any security deposits which are other than cash. This paragraph shall survive closing of title.

§10.04.    A <ins>certified</ins> schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.05.    All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

§10.06.    An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in those Service Contracts, insurance policies, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller.

~~§10.07.    (a)  Written consent(s) of the Mortgagee(s), if required under §2.03(b), and (b) certificate(s) executed by the Mortgagee(s) in proper form for recording and certifying (i) the amount of the unpaid principal balance thereof, (ii) the maturity date thereof, (iii) the interest rate, (iv) the last date to which interest has been paid thereon and (v) the amount of any escrow deposits held by the Mortgagee(s). Seller shall pay the fees for recording such certificate(s). Any Mortgagee which is an Institutional Lender may furnish a letter complying with Section 274-a of the Real Property Law in lieu of such certificate.~~

~~§10.08.    An assignment of all Seller's right, title and interest in escrow deposits for real estate taxes, insurance premiums and other amounts, if any, then held by the Mortgagee(s).~~

§10.09.    All original insurance policies with respect to which premiums are to be apportioned or, if unobtainable, true copies or certificates thereof.

§10.10.    To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.11.    Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name.

§10.12.    (a)  Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, and (b) a certification of non-foreign status, in form required by the Code Withholding Section, signed under penalty of perjury. Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

§10.13.    To the extent they are then in Seller's possession, copies of current painting and payroll records. Seller shall make all other Building and tenant files and records available to Purchaser for copying, which obligation shall survive the Closing.

§10.14.    An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises to Purchaser and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

§10.15.    Notice(s) to the Mortgagee(s), executed by Seller or by its agent, advising of the sale of the Premises to Purchaser and directing that future bills and other correspondence should thereafter be sent to Purchaser or as Purchaser may direct.

§10.16.    If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law. The deed referred to in §10 01 shall also contain a recital sufficient to establish compliance with such law. <ins>written consent of all members of Seller.</ins>

§10.17.    Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

8

§10.18.  A blanket assignment, ~~reasonably~~ without recourse or representation, of all Seller's right, title and interest, if any, to all contractors', suppliers', materialmen's and builders' guarantees and warranties of workmanship and/or materials in force and effect with respect to the Premises on the Closing Date and a true and complete copy of each thereof.

§10.19.  Estoppel letters in the form attached hereto as Schedule F from the following tenants: all commercial tenants reasonably acceptable to Purchaser

§10.20.  A certificate of Seller confirming that the warranties and representations of Seller set forth in this contract are true and complete on and as of the Closing Date (the statements made in such certificate shall be subject to the same limitations on survival as are applicable to Seller's representations and warranties under §4).

§10.21.  Any other documents required by this contract to be delivered by Seller.

## Section 11.    Purchaser's Closing Obligations

At the Closing, Purchaser shall:

§11.01.  Deliver to Seller checks or wire transfer of immediately available federal funds to Seller, in payment of the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12, plus the amount of escrow deposits, if any, assigned pursuant to §10.08.

~~§11.02.  Deliver to Seller the Purchase Money Mortgage, if any, in proper form for recording, the note secured thereby, financing statements covering personal property, fixtures and equipment included in this sale and replacements thereof, all properly executed, and Purchaser shall pay the mortgage recording tax and recording fees for any Purchase Money Mortgage.~~

§11.03.  Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.03.

§11.04.  Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.05.  Deliver to Seller an agreement assuming all of landlord's obligations under the Leases from and after the Closing Date and indemnifying and agreeing to defend Seller against any claims made by tenants with respect to any failure to perform such obligations.

§11.06.  Deliver to Seller a certificate confirming that the warranties and representations of Purchaser set forth in this contract are true and complete as of the Closing Date.

§11.07.  Deliver any other documents required by this contract to be delivered by Purchaser.

## Section 12.    Apportionments

§12.01.  The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)  prepaid rents and Additional Rents (as defined in §12.03) and revenues, if any, from telephone booths, vending machines and other income-producing agreements;

(b)  ~~interest on the Existing Mortgage(s);~~

(c)  real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premise, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(d)  wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises, whose employment was not terminated at or prior to the Closing;

(e)  value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes;

(f)  ~~charges under transferable Service Contracts or permitted renewals or replacements thereof;~~

(g)  permitted administrative charges, if any, on tenants' security deposits;

(h)  dues to rent stabilization associations, if any;

(i)  insurance premiums on transferable insurance policies listed on a schedule hereto or permitted renewals thereof;

(j)  ~~Reletting Expenses under §6.02, if any; and~~

(k)  any other items listed in Schedule D.

(l)  interest, if any, on the deposit shall go to the party receiving same.

9

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. An discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02.   If any tenant is in arrears to the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be [as long as such Tenant's arrears is not more than 2 months at closing] applied in the following order of priority: (a) first to the month preceding the month in which the Closing occurred; (b) then to the month in which the Closing occurred (c) then to any month or months following the month in which the Closing occurred; and (d) then to the period prior to the month preceding the month in which the Closing occurred. If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

§12.03.   If any tenants are required to pay percentage rent, escalation charges for real estate taxes, operating expenses, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing. If any tenant is or becomes entitled to a refund of overpayments of Additional Rent which are attributable in whole or in part to any period prior to the Closing, Seller shall pay to Purchaser an amount equal to the amount of such refund attributable to any such period within ten days after notice from Purchaser, which obligation shall survive the Closing.

Section 13.    Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien

§13.01.   Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days or until the expiration date of any written commitment of Purchaser's Institutional Lender delivered to Purchaser prior to the scheduled date of Closing, whichever occurs first, to remove any defects in or objections to title noted in such title report and any other defects or objections which may be disclosed on or prior to the Closing Date.

§13.02.   If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this contract or if Purchaser shall have any other grounds under this contract for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey with a credit against the monies payable at the Closing equal to the reasonably estimated cost to cure the same (up to the Maximum Expense described below), but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this contract and the sole liability of Seller shall be to refund the Downpayment to Purchaser and to reimburse Purchaser for the net cost of title examination, but not to exceed the net amount charged by Purchaser's title company therefor without issuance of a policy, and the net cost of updating the existing survey of the Premises or the net cost of a new survey of the Premises if there was no existing survey or the existing survey was not capable of being updated and a new survey was required by Purchaser's Institutional Lender. Upon such refund and reimbursement, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in Schedule D (or if none is so specified, the Maximum Expense shall be one-half of one percent of the Purchase Price) to cure any title defect or to enable Seller otherwise to comply with the provisions of this contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to the extent of the monies payable at the Closing, mortgages or other liens on the Premises which can be satisfied or discharged by payment of a sum certain, other than Existing Mortgages, of which Seller has actual knowledge. Anything to the contrary herein notwithstanding, Seller shall pay and remove, for the payment of money; all non-administrative governmental liens for the payment of money, all mortgages, all mechanics' liens, all voluntary liens and encumbrances, and all other monetary liens.

§13.03.   Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §2.02. If Purchaser's title insurance company is willing to insure both Purchaser and Purchaser's Institutional Lender, if any, that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, unless Purchaser's Institutional Lender reasonably refuses to accept such insurance in lieu of actual payment and discharge, Seller shall have the right, in lieu of payment and discharge to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

[in any and all events] §13.04.   If Purchaser shall default in the performance of its obligation under this contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain.

§13.05.   Purchaser shall have a vendee's lien against the Premises for the amount of the Downpayment, but such lien shall not continue after default by Purchaser under this contract.

**Section 14.    Broker**

§14.01   If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D. If no broker is specified in Schedule D, the parties acknowledge that this contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

**Section 15.    Notices**

§15.01   All notices under this contract shall be in writing and shall be delivered personally or by fax with receipt confirmation or shall be sent by prepaid registered or certified mail, or by prepaid overnight courier with receipt acknowledged, addressed as set forth in Schedule D, or as Seller or Purchaser shall otherwise have given notice as herein provided. Attorneys may give and receive notice for the parties.

**Section 16.    Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

§16.01.   Except as otherwise provided in this contract, no representatives, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action based thereon shall be commenced after the Closing. The representations, warranties, covenants and other obligations of Seller set forth in §4.03, §6.01 and §6.02 shall survive until the Limitation Date specified in Schedule D (or if none is so specified, the Limitation Date shall be the date which is six months after the Closing Date), and no action based thereon shall be commenced after the Limitation Date.

§16.02.   The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

**Section 17.    Due Diligence Period**

§17.01.   During the period (the "Due Diligence Period") commencing on the date hereof and ending at 5:00 P.M. Eastern Standard Time on the 30th day following the date hereof, Purchaser shall have the right to have the Premises inspected during reasonable hours, after reasonable notice to Seller, and to obtain the following inspection reports with respect to the Premises, at Purchaser's sole cost and expense:

(a)   An inspection and report (the "Environmental Report") from a licensed environmental inspection laboratory or a licensed engineer (the "Inspection Company") with respect to the presence or absence of hazardous or toxic substances or conditions at the Premises including, without limitation, asbestos, polychlorinated biphenyls, petroleum products and those hazardous substances defined in the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. and all amendments thereto, including, without limitation, the Superfund Amendments and Reauthorization Act, 42 U.S.C. § 9601 et seq., and the rules and regulations promulgated thereunder; New York State Environmental Liability Review Act, New York Environmental Conservation Law (ECL) §§8-0101 et seq.; and the New York State Water Pollution Control Act, ECL §§ 17-0101 et seq., (collectively, "Hazardous Substances") , on the Premises; and

(b)   An inspection and report (the "Engineering Report") from a licensed engineer and other appropriate professionals (collectively, the "Engineer") with respect to the structural and physical condition of the Premises, all mechanical systems and utilities servicing the Premises, curtain walls, roofs, wells, septic and drainage systems, and compliance with the Americans with Disabilities Act (collectively, "Building Conditions").

§17.02.   Purchaser shall cause copies of the Environmental Report and Engineering Report (collectively, the "Reports") to be delivered to Seller prior to the expiration of the Due Diligence Period. Purchaser may elect to cancel this contract, by written notice (the "Termination Notice") to Seller delivered on or before the last day of the Due Diligence Period, if (i) the Environmental Report states that there are Hazardous Substances on the Premises or (ii) the Engineering Report states that there are defects in the Building Conditions (a "Defective Condition") and, in the best professional judgment of the Engineer, such Defective Condition(s) will cost in excess of $ 25,000_____ to correct. unless Seller elects to pay any excess amount over $25,000, in which case the Contract will remain in full force and effect.

§17.03.   During the Due Diligence Period, Seller agrees to cooperate in all reasonable respects with Purchaser and agrees to make available to Purchaser and its agents all of the books, files and records relating to the Premises which are in the possession or under the control of Seller.

§17.04.   Purchaser hereby indemnifies and agrees to defend and hold Seller harmless from all loss, cost (including, without limitation, reasonable attorneys' fees), claim or damage caused by the inspection of the Premises by Purchaser, its agents, consultants or representatives.

§17.05.  TIME SHALL BE OF THE ESSENCE WITH RESPECT TO PURCHASER'S ACTIONS TO THIS SECTION 17.  In the event Purchaser shall (i) fail to have the Premises inspected prior to the expiration of the Due Diligence Period, (ii) fail to deliver a copy of the Reports to Seller prior to the expiration of the Due Diligence Period or (iii) fail to give the Termination Notice prior to the expiration of the Due Diligence Period, Purchaser shall be deemed to have waived the right to cancel this contract as provided in §17.02.

Section 18.        Miscellaneous Provisions

§18.01.  If consent of the Existing Mortgagee(s) is required under §3.03(b), Purchaser shall not assign this contract or its rights hereunder without prior written consent of Seller. No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§18.02.  This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statement, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or termination except by an instrument signed the party against whom the enforcement of such waiver, modification, amendment, discharge or termina5tion is sought, and then only to the extent set forth in such instrument.

§18.03.  This contract shall be governed by, and construed in accordance with, the law of the State of New York.

§18.04.  The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§18.05.  This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§18.06.  This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

§18.07.  As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§18.08  If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail. Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date first above written.

Seller:

By: 1551 St. Nicholas LLC, c/o New Realty Management, Inc.

Diho Doani

By Johovo Doani ATTY in fact

Purchaser:

By: Milbank Real Estate Services, Inc.

12

## RIDER

Section 19.    Anything hereinabove to the contrary notwithstanding:

§19.01  "As Is" Clause.        Purchaser represents and agrees that Purchaser has fully and completely investigated, examined and inspected said Purchaser and the personal property included in this sale and is purchasing the same "as is" at the date hereof, subject to reasonable wear and tear, obsolescence and natural deterioration between the date hereof and the Closing Date.  The Contract, as written, contains all the terms of the agreement entered into between the parties, and Purchaser acknowledges that Seller has made no representations, warranties (expressed or implied), guarantees, promises, statements or information pertaining to the condition, income, expense, operation or use to which the premises or personal property can be applied, including, but not limited to, any matter or thing affecting or relating to the said premises or personal property, except as specifically set forth herein.  Seller is not bound or liable in any manner by any oral or written statements, representations, real estate brokers' "set-ups" or information pertaining to the above premises furnished by any real estate broker, agent, employee, person or entity, unless specifically set forth herein.  The provisions of this paragraph shall survive the Closing.

§19.02  Delivery of Deed.        The acceptance of a deed by Purchaser shall be deemed full compliance by Seller with all of the provisions of this Contract on the part of Seller to be performed, except as to those matters specifically provided herein to survive the Closing.

Schedule A

## DESCRIPTION OF PREMISES

(to be attached separately and to include tax map designation)

1551 St. Nicholas Avenue

## SCHEDULE A 1

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of 188th Street, with the westerly side of St. Nicholas Avenue;

RUNNING THENCE Westerly along the southerly side of 188th Street, 100 feet;

THENCE Southerly and parallel with said westerly side of St. Nicholas avenue, 94 feet 10-½ inches to the center line of the block;

THENCE Easterly parallel with the southerly side of 188th Street and along said center line of the block, 100 feet to the westerly side of St. Nicholas Avenue;

THENCE Northerly along said westerly side of St. Nicholas Avenue, 94 feet 10-½ inches to the corner aforesaid to the point or place of BEGINNING.

SAID PREMISES known as 1551 St. Nicholas Avenue, a/k/a 600 West 188th Street, New York, N.Y.

## Schedule B

## PERMITTED EXCEPTIONS

1.    Zoning _____ regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

2.    Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3.    ~~The Existing Mortgage(s) and financing statements, assignments of leases and other collateral assignments ancillary thereto.~~

4.    Leases and Tenancies specified in the Rent Schedule and any new leases or tenancies not prohibited by this contract.

5.    ~~Unpaid installments of assessments not due and payable on or before the Closing Date.~~

6.    Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants. provided title company will omit.

7.    (a)    Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises.

(b)    Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises. provided title company will insure the encroachments remain as long as the building stands.

(c)    Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

(d)    Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable. For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title unmarketable, and Purchaser shall accept title subject thereto:

(e)    Covenants, restrictions, reservations, utility easements and agreements, if any, of record, insofar as the same may now be in force and/or effect, provided same are not violated by present structure or present use of the Premises and continued use as presently occupied.

(f)    Party wall or party wall agreements of record, if any.  Seller shall comply with such agreements until closing.

## Schedule C

## PURCHASE PRICE

The Purchase Price shall be paid as follows:

(a)  By check subject to collection, the receipt of
which is hereby acknowledged by Seller:                    $              900,000.00

(b)  By check or checks delivered to Seller at the
Closing in accordance with the provisions of
§2.02:                                                     $            8,100,000.00

(c)  By acceptance of title subject to the following
Existing Mortgage(s):                                     $                    0.00

(d)  By execution and delivery to Seller by
Purchaser or its assignee of a note secured by a
Purchase Money Mortgage on the Premises,
payable as follows:                                       $                    0.00

                                                          _____

Purchase Price                                            $            9,000,000.00

Schedule D

## MISCELLANEOUS

1. Title insurer designed by the parties (§1.02):  **Any reputable title company**

2. Last date for consent by Existing Mortgagee(s) (§2.03(b)):  **N/A**

3. Maximum Interest Rate of any Refinanced Mortgage (§2.04(b)):  **N/A %**

4. Prepayment Date on or after which Purchase Money Mortgage may be prepaid (§2.04(c)):

5. Seller's tax identification number (§2.05):

6. Purchaser's tax identification number (§2.05):

7. Scheduled time and date of Closing (§3.01):  **60 days from date Purchaser's Attorney receives fully executed contract**  **10 a.m.**

8. Place of Closing (§3.01):  **Beckman, Lieberman & Barandes, LLC or Lender's Attorney** or Lender

9. Assessed valuation of Premises (§4.10):

   Actual Assessment:

   Transition Assessment:

10. Fiscal year and annual real estate taxes on Premises (§4.10):

11. Tax abatements or exemptions affecting Premises (§4.10):

12. Assessments on Premises (§4.13):

13. Maximum Amount which Seller must spend to cure violations, etc. (§7.02):  **$2,500.00**

14. Maximum Expense of Seller to cure title defects, etc. (§13.02):  **$2,500.00**

15. Broker, if any (§14.01):  **Caprì & Associates, Inc.**

16. Party to pay broker's commission (§14.01):  **Purchaser**

17. Address for notices (§15.01):

    If to Seller:  **1551 St. Nicholas LLC,  c/o New Realty Management, Inc.**
    **450 Seventh Ave,**
    **New York, New York  10123-0101**
    with a copy to Seller's attorney:  **Michael Beckman, Beckman, Lieberman & Barandes, LLC**
    **116 John Street, Suite 1313**
    **New York, New York  10038**
    If to Purchaser:  **Milbank Realty Service, Inc.**
    **19 W. 44th Street, Room 1507,**
    **New York, New York  10036**
    with a copy to Purchaser's attorney:  **Seymour Hurwitz**
    **19 W. 44th Street, Room 1507**
    **New York, New York 10036**

18. Limitation Date for actions based on Seller's surviving representations and other obligations (§16.01):  **One (1) year**

19. Additional Schedules or Riders (§17.08):

© 2004 Matthew Bender & Co., a member of the LexisNexis Group.

Schedule E

RENT SCHEDULE

(to be attached separately)

Dec 21 2006 6:08PM    HP LASERJET FAX

## Rent Roll as of 12/20/06

1551 1551 ST. NICHOLAS, LLC

12/20/06 17:14:5

| Aptcd | Name | Rooms | Type | S8 SC | Base Rent | Sect.8 | Net | Security | Lease Exp. |
|-------|------|-------|------|-------|-----------|--------|-----|----------|-----------|
| 1A | VALERIO,SIXTO | 4.0 | Stab | | 537.59 | 0.00 | 537.59 | 537.59 | 07/31/08 |
| 1B | PADILLA,JULIO | 5.0 | Stab | | 484.45 | 0.00 | 484.45 | 484.45 | 05/31/08 |
| 1C | JIMENEZ,VENECIA | 3.0 | Stab | S8 | 1,113.71 | 0.00 | 1,113.71 | 1,113.71 | 02/29/08 |
| 1D | REYES MORELOS,JUAN | 4.0 | Stab | | 1,011.75 | 0.00 | 1,011.75 | 950.00 | 04/30/07 |
| 1E | HICIANO,MARGARITA | 3.0 | Stab | | 792.23 | 0.00 | 792.23 | 743.88 | 07/31/07 |
| 1F | LUGO,MARIA | 5.0 | Stab | S8 | 1,166.52 | 0.00 | 1,166.52 | 184.52 | 09/30/08 |
| 2A | SERRANO,PASCUAL | 4.0 | Stab | S8 | 902.44 | 0.00 | 902.44 | 847.36 | 04/30/07 |
| 2B | HERNANDEZ,MARIA | 5.0 | Stab | S8 | 1,537.24 | 0.00 | 1,537.24 | 1,324.00 | 07/31/07 |
| 2C | CUENCA,ALEJANDRO | 3.0 | Stab | | 886.08 | 0.00 | 886.08 | 832.00 | 08/31/07 |
| 2D | HIDALGO POLO,FORTINO | 4.0 | Stab | | 1,074.03 | 0.00 | 1,074.03 | 950.00 | 02/29/08 |
| 2E | JUAREZ,CARLOS | 3.0 | Stab | | 967.44 | 0.00 | 967.44 | 806.20 | 12/31/07 |
| 2F | HENRIQUEZ,GORGITA | 5.0 | Stab | | 993.92 | 0.00 | 993.92 | 993.92 | 08/31/08 |
| 2G | DE JESUS,FLORIBERTO | 4.0 | Stab | | 1,431.89 | 0.00 | 1,431.89 | 1,431.89 | 05/30/07 |
| 2H | HERNANDEZ,RAMIRO R | 3.0 | Stab | | 941.46 | 0.00 | 941.46 | 884.00 | 08/31/07 |
| 3A | ALBERTO,CLEMENCIA | 4.0 | Stab | S8 | 936.26 | 0.00 | 936.26 | 1,004.14 | 02/28/07 |
| 3B | GUZMAN,ONELIA | 5.0 | Stab | | 594.57 | 0.00 | 594.57 | 594.57 | 10/31/07 |
| 3C | GUZMAN,THELMA | 3.0 | Stab | S8 | 864.47 | 0.00 | 864.47 | 0.00 | 01/31/07 |
| 3C1 | GUZMAN,THELMA | 0.0 | | | 0.00 | 0.00 | 0.00 | 0.00 | 01/31/07 |
| 3D | NUNEZ,ANGELA | 4.0 | Stab | SC | 755.79 | 0.00 | 755.79 | 704.70 | 11/30/08 |
| 3E | MONTEAGUDO,HIRMA | 3.0 | Stab | SC | 427.31 | 0.00 | 241.05 | 427.31 | 05/31/08 |
| 3F | MENDEZ | 5.0 | Stab | S8 | 1,258.40 | 0.00 | 1,258.40 | 0.00 | 03/31/07 |
| 3G | VELASQUEZ,CARMEN | 4.0 | Stab | S8 | 1,133.89 | 0.00 | 1,133.89 | 1,087.66 | 10/31/07 |
| 3H | ACEVEDO,HABNEL D | 3.0 | Stab | | 850.16 | 0.00 | 850.16 | 886.29 | 01/31/07 |
| 4A | NAGLE,MARY | 4.0 | Contr | | 191.99 | 0.00 | 191.99 | 0.00 | / / |
| 4B | HERNANDEZ,FRANCISCA | 5.0 | Stab | | 659.30 | 0.00 | 659.30 | 624.93 | 02/29/08 |
| 4C | RAMIREZ,ANTONIO | 3.0 | Stab | | 907.13 | 0.00 | 907.13 | 907.13 | 04/30/08 |
| 4D | STEFANIDIS,MARIA | 4.0 | Stab | | 527.97 | 0.00 | 527.97 | 527.97 | 03/31/07 |
| 4E | REYES,MICHAEL | 3.0 | Stab | | 421.11 | 0.00 | 421.11 | 421.11 | 05/31/08 |
| 4F | HERNANDEZ,ERASMO | 5.0 | Stab | | 561.96 | 0.00 | 561.96 | 532.86 | 04/30/08 |
| 4G | LARA,SOLEDAD | 4.0 | Stab | S8 | 994.24 | 0.00 | 994.24 | 0.00 | 03/31/07 |
| 4H | ARRIAGA,JESUS | 3.0 | Stab | | 942.51 | 0.00 | 942.51 | 887.37 | 06/30/08 |
| 5A | RODRIGUEZ,MERCEDES | 4.0 | Stab | | 593.35 | 0.00 | 593.35 | 569.16 | 10/31/07 |
| 5B | BOLANOS,BERNARDO | 5.0 | Stab | | 1,576.04 | 0.00 | 1,576.04 | 1,493.88 | 07/31/08 |
| 5C | RIVERA VALENCIA,CARLOS | 3.0 | Stab | | 1,102.56 | 0.00 | 1,102.56 | 1,102.58 | 06/30/07 |
| 5D | BETANCES,GENARA | 4.0 | Stab | S8 | 1,058.49 | 0.00 | 1,058.49 | 986.94 | 09/30/08 |
| 5E | LASSO,HUMBERTO | 3.0 | Stab | | 763.13 | 0.00 | 763.13 | 818.46 | 12/31/06 |
| 5F | RODRIGUEZ,ANA BARBARA | 5.0 | Stab | S8 | 1,466.03 | 0.00 | 1,466.03 | 1,378.54 | 02/28/07 |
| 5G | SANTOS,REINA | 4.0 | Stab | S8 | 1,021.47 | 0.00 | 1,021.47 | 1,008.48 | 02/28/07 |
| 5H | FRIAS,ROSA | 3.0 | Stab | | 781.42 | 0.00 | 781.42 | 781.42 | 09/30/07 |
| BB | SOLER,CONSUELO | 4.0 | Stab | | 450.00 | 0.00 | 450.00 | 0.00 | 04/30/07 |
| C1551 | GUZMAN | 0.0 | COMM | | 2,144.00 | 0.00 | 2,144.00 | 5,108.00 | 04/30/07 |
| C1553 | ELEODORO J MATA, | 0.0 | COMM | | 3,200.00 | 0.00 | 3,200.00 | 8,400.00 | 10/31/11 |
| C1555 | TAQUERIA, | 0.0 | COMM | | 3,932.00 | 0.00 | 3,932.00 | 8,000.00 | 11/30/07 |
| C15552 | PAYAMPS GROCERY | 0.0 | COMM | | 3,700.00 | 0.00 | 4,070.00 | 8,400.00 | 03/31/11 |
| C1557 | DELI MATER,AHMED | 0.0 | COMM | | 4,816.00 | 0.00 | 5,268.00 | 6,600.00 | 03/31/07 |
| C1559 | NUNEZ RESTAURANT | 0.0 | COMM | | 5,899.00 | 0.00 | 5,899.00 | 11,304.00 | 10/31/07 |
| C600/1 | ESPINO CLOTHING STORE | 0.0 | COMM | | 1,950.00 | 0.00 | 1,950.00 | 3,900.00 | 02/29/12 |
| C600/2 | ORTIZ CANDY | 0.0 | COMM | | 2,380.00 | 0.00 | 2,380.00 | 7,500.00 | 12/31/08 |

| # of Units: 48 | Monthly Total: | 152.0 | | | 62,703.30 | 0.00 | 63,337.04 | 66,046.80 | |
| | Yearly Total: | | | | 752,439.60 | 0.00 | 760,044.48 | | |

Page 1

**Outstanding Balances as of 12/20/06**                    12/20/06 17:05:23

### 1551  1551 ST. NICHOLAS, LLC

| Unit | Name | Type | S8 | SC | Security | Rent Amount | Balance | Lease Expiration | Move In Date |
|------|------|------|----|----|----------|-------------|---------|------------------|--------------|
| 1B | PADILLA, JULIO | Stab | | | 484.45 | 484.45 | 15.00 | 05/31/08 | 01/01/00 |
| 1E | HICIANO, | Stab | | | 743.88 | 792.23 | 4,518.04 | 07/31/07 | 01/01/00 |
| 2B | HERNANDEZ, MARIA | Stab | S8 | | 1,324.00 | 1,537.24 | 1,537.24 | 07/31/07 | 06/06/06 |
| 2C | CUENCA, | Stab | | | 832.00 | 886.08 | 50.00 | 08/31/07 | 06/28/02 |
| 2D | HIDALGO POLO, | Stab | | | 950.00 | 1,074.03 | 1,952.34 | 02/29/08 | 03/15/03 |
| 2F | HENRIQUEZ, | Stab | | | 993.92 | 993.92 | 6,059.48 | 08/31/08 | 01/01/00 |
| 3B | GUZMAN, ONELIA | Stab | | | 594.57 | 594.57 | 1,228.74 | 10/31/07 | 01/01/00 |
| 3C | GUZMAN, THELMA | Stab | S8 | | 0.00 | 864.47 | 2,075.69 | 01/31/07 | 03/26/98 |
| 3D | NUNEZ, ANGELA | Stab | | SC | 704.70 | 755.79 | 315.17 | 11/30/08 | 11/30/91 |
| 3F | MENDEZ | Stab | S8 | | 0.00 | 1,268.40 | 1,428.40 | 03/31/07 | 04/01/95 |
| 3G | VELASQUEZ, | Stab | S8 | | 1,087.66 | 1,133.89 | 443.73 | 10/31/07 | 09/01/01 |
| 3H | ACEVEDO, HABNEL | Stab | | | 886.29 | 850.16 | 850.16 | 01/31/07 | 02/01/02 |
| 4C | RAMIREZ, ANTONIO | Stab | | | 907.13 | 907.13 | 2,355.23 | 04/30/08 | 05/20/01 |
| 4G | LARA, SOLEDAD | Stab | S8 | | 0.00 | 994.24 | 294.49 | 03/31/07 | 02/01/98 |
| 5A | RODRIGUEZ, | Stab | | | 568.16 | 593.35 | 994.43 | 10/31/07 | 01/01/00 |
| 5D | BETANCES, GENARA | Stab | S8 | | 986.94 | 1,058.49 | 68.61 | 09/30/08 | 01/01/00 |
| 5F | RODRIGUEZ, ANA | Stab | S8 | | 1,376.54 | 1,466.03 | 817.74 | 02/28/07 | 03/01/03 |
| 5G | SANTOS, REINA | Stab | S8 | | 1,008.48 | 1,021.47 | 131.25 | 02/28/07 | 01/01/95 |
| 5H | FRIAS, ROSA | Stab | | | 781.42 | 781.42 | 781.42 | 09/30/07 | 11/08/00 |
| BB | SOLER, CONSUELO | Stab | | | 0.00 | 450.00 | 450.00 | 04/30/07 | 05/01/06 |
| | | | | | 14,233.14 | 18,497.36 | 26,367.16 | | |

✱ Court Stmp

*Page 1*

## RIDER TO CONTRACT

In addition to the printed form of the Contract and Rider thereto, the parties make the following agreements and representations, to survive the closing of title:

1.  The Seller makes the following representations which are true as of the date hereof and shall be true at closing:

    (a)  Except as set forth on the annexed rent schedule, there are no rents more than thirty (30) days past due. Said rents do not exceed the legal maximum rent allowed by law. The annexed rent roll is true and correct.

    (b)  There are no actions with reference to the Seller or the premises pending with any court or in any forum; that no tenant has been given any concession or consideration for the rental of any space; that no utilities are included in any rent; that none of the apartments are rented furnished or for professional purposes; each tenant pays for his own gas and electricity; there are no prepaid rents in excess of one month.

    (c)  None of the tenants have any lease or agreement conferring any rights or estate in the premises and there are no claims, counterclaims or offsets by any tenant, except as indicated on the rent schedule and said leases or agreements, if any, expire as indicated on said rent schedule and are presently in full force and effect without any modifications; that any and all leases which have not been exhibited to and initialed by or on behalf of the purchaser, contain no unusual clauses and all leases contain agreements fully subordinating them to any existing or future mortgage or mortgages in any amounts and on any terms.

    (d)  All space as listed on the annexed rent roll is legally occupied and approved by departments having jurisdiction and/or a permanent certificate of occupancy for the building as presently constituted and used is in existence and the original or a certified copy thereof will be furnished to the purchaser at closing. (Attach Certificate of Occupancy.)

    (e)  No demand has been made by any mortgagee or insurance company requiring any work to be done on the premises or for additional fire insurance and if there are any, Seller shall comply with same at seller's sole cost and expense. The seller shall maintain the premises in their present order and repair and shall make any and all repairs or replacements until closing so as to deliver the premises in substantially their present condition, usual wear and tear excepted.

    (f)  There are no union contracts or agreements in effect and seller has had no communications during its ownership from any labor unions or the State or Federal Labor Relations Board. Seller will not enter into any negotiations or execute any contract with a labor union between contract and closing.

    (g)  The compensation of help regularly employed in connection with the building is as follows: superintendent: approximately $500-600 per week, plus free gas, electricity and telephone; Any vacation pay or other benefits (i.e., sick pay, holiday pay, etc.) to which the superintendent or other help is entitled by reason of past services, and pension and welfare, if any, shall be adjusted on the closing. If there be any pending negotiations with any union or with any service contract holder which may involve retroactive increases in pay or rates, seller is to reimburse the purchaser for the amount thereof up to the closing date. Seller shall deliver an affidavit from superintendent and/or seller at closing that the superintendent is not a rent paying tenant.

    (h)  The seller is the record title owner of the premises.

    (i)  Intentionally omitted.

(j)   If in Seller's possession, all oil burners, incinerators and other fuel burning devices comply with all applicable Federal, State and Municipal or other governmental or quasi-governmental bodies having jurisdiction, air pollution control laws, orders, rules and regulations, including but not limited to, Local Law 14 of the City of New York, and have all been properly upgraded and current certificates or operation as of the closing will be issued, copies of which will be delivered at the time of closing.

(k)   Except as set forth on the annexed rent schedule, all fixtures and articles of personal property included in this sale are now and at the closing of title will be owned by the seller, free and clear of any conditional bills of sale, chattel mortgages, security agreements or financing statements or other security interests of any kind other than the lien of the first mortgage herein referred to. All fixtures and equipment will be in working order, normal wear and tear excepted and in good operating condition at the time of closing.

(l)   The apartments on Rent Roll and no others are subject to senior citizen abatements and/or Section 8 abatement. Sell shall supply proof of compliance with appropriate authorities and shall deliver at closing copies of all certifications and original documents in order to collect abatements

(m)   For the past twelve (12) months there has been no organized rent strike or joint action by tenants' groups to withhold rent from the seller. It is a condition of this transaction that there will be no such rent strike or action by tenants' groups to withhold rent from the seller at the closing of title.   There has been no harassment or 7A proceedings. It is a condition of this contract that there will be no such harassment or 7A proceedings at the closing of title.

(n)   The only service contracts now in effect are as follows: NONE

      Copies of the contracts are annexed hereto; none of the contracts shall be modified or extended without purchaser's prior written consent.

(o)   Any repairs or alterations or equipment to be furnished pursuant to the terms of any lease agreement or as required by law will be done or supplied by seller at seller's own cost before closing.

(p)   If applicable, Seller has complied with the requirements of Local Laws 5, 10 and 16 and shall supply proof of same at closing.

(q)   The premises is not subject to landmark status or is in a Landmark District nor is any such proceeding pending or threatened.

(r)   The premises will at closing be in compliance with all regulations governing bulk storage of petroleum.  Seller shall deliver proof at closing.

(s)   Intentionally omitted.

(t)   Seller represents that it has made all required filings and registrations with respect to the Division of Housing and Community Renewal pursuant to the Omnibus Housing Act.  Seller will furnish to purchaser at closing proof of all such filings, required registration and notices.

(u)   Only if applicable, Seller shall cause all required elevator self-inspections to be made for the current year and all prior years, and has or will file appropriate certificates with reference thereto; any fines or penalties imposed which result from the failure to comply with the foregoing shall be the responsibility of Seller.  This clause shall survive closing.

2

(v)    There are no pending or threatened condemnation proceedings nor does seller have notice or knowledge of any.

(w)    If there are any pending certiorari proceedings for the reduction of taxes, seller shall not settle any such claim for the current tax year without the prior written consent of the purchaser.

2.    Seller pay all fines and penalties on title report.

3.    The downpayment shall be deemed made for the account of the seller by paying same to seller's attorney to be held in escrow subject to the terms of this contract.

4.    No party, other than the named purchaser, shall be liable hereunder as disclosed or undisclosed principal.

5.    Seller waives all rights to institute action for specific performance of this contract and in the event of default by the purchaser, the downpayment shall constitute liquidated damages and the sole obligation of purchaser in any and all events.

6.    Any instrument, or deposit in order to obviate a defect in marketability, or to indicate the terms and reduced amount of any mortgage or other lien on the premises, shall be in such form, conditions and amount as may be required by the title insurance company employed by the purchaser to examine and insure title and to satisfy said company sufficiently for them to certify the said facts and/or to omit any exception to title, and/or to guarantee to the purchaser against collection of any item out of the premises and said deposits, at purchaser's option shall be made with the said title company, without limiting the foregoing, the same shall be taken to include affidavits or consents of stockholders, directors and officers approving any acts of corporations in the chain of title, and proof of payment of franchise or dissolution taxes therefor.

7.    All documents or instruments initialed by or on behalf of the parties to this contract or incorporated in this contract by reference or referred to herein, and any and all surveys, mortgages, bonds or notes, consolidation or extension agreements, leases, service contracts, insurance policies, rent registrations or other documents affecting the premises shall be delivered to the purchaser or its assigns at closing;a nd prior thereto the same may be inspected at all reasonable times at the office of the attorney for the seller.

8.    Seller shall not remove any supplies or equipment now on the premises which are used in connection with the operation of the building.

9.    The seller agrees to make available to the purchaser, prior to and/or after the closing of title at any time upon demand, all records of the seller, or the seller's agents, in connection with the management and operation of the premises during the period of the seller's ownership, and to loan to the purchaser all paid bills, vouchers, cancelled checks, and other documents as may be requested by purchaser. At closing, seller will deliver to the purchaser all original leases and rent records and histories for all apartments at the premises.

10.    In the event there is any claim by any tenant as a result of any rent overcharge or failure to provide services such obligation shall remain the seller's through the date of closing and seller shall and does hereby agree to indemnify Purchaser and to hold the purchaser harmless as a result of any such claims together with all costs and expenses including but not limited to reasonable counsel fees incurred; to survive closing.

11.    Notwithstanding anything to the contrary contained herein, the parties agree that any changes or additions in the within contract may be initialed by the respective attorneys for the parties

3

with the same force and effect as if initialed by the parties and the attorneys may agree to adjournments in writing.

12.  Seller shall install prior to closing at its own cost and expense the smoke alarms and window guards as required by the Department of Buildings in each apartment and deliver certifications and proof of compliance.

13.  Any mortgage presently affecting the premises which the seller must discharge in accordance with the provisions of this contract shall, at purchaser's option, and with reasonable charge or cost to purchaser, be satisfied or assigned to purchaser's designee and seller shall deliver all original notes, mortgages and prior assignments.

14.  At the closing, Seller shall deliver to Purchaser:

(a)  All the leases (current and expired), rent histories, contracts and other instruments which relate to the operation of the premises, if any.

(b)  Possession of the premises, subject only to the rights of tenants under the leases to be assigned hereunder by seller to purchaser.

(c)  A valid current Certificate of Operation, only if applicable, and current triennial covering the heating equipment int he premises.

(d)  Architect's or Engineer's report or other required document showing compliance with Local Laws 5, 10, 11 and 16, if applicable.

(e)  Current Heating Plant Self-Inspection Certificate.

(f)  Smoke detector and window guard certificate of installation and compliance.

(g)  A current rent roll, certified to by seller as being true and correct, together with a Schedule of Rent arrears, prepaid rents and rent escalations and adjustments.

(h)  Estoppel certificates or affidavits from each of the commercial tenants in the form as requested by the purchaser indicating, but not excluding, the following: the date of the lease, the name of the landlord and tenant, the inception date of the lease, the expiration date of the lease, the term of the lease remaining, the base monthly rent, security and form of same, any and all additional rents for percentage rent, escalation, for real estate taxes, insurance, heat, security guard, electricity, etc., identify the lease and amendments, that no work is required of lessor or that lessor is not in default and the terms, there are no defaults of landlord and no counterclaims, whether the lease and all payments of rent are current, if there are any claims by the tenant under the lease, whether there are any options to renew the lease or rights of first refusal to purchase the premises, etc., that the lease is in full force and effect, and all other matters, reasonably requested by purchaser.

(i)  For purposes of commencing litigation, Seller shall assign to Purchaser all past due rents, subject to adjustments and apportionments between Purchaser and Seller, reflecting rent or arrears shall be as set forth in Section 12.02(a).  An assignment of all past due rents subject to adjustments.

(j)  Only if applicable, current certifications verifying one (1) year, two (2) year, and five (5) year elevator inspection tests (DOB form ELV3)

(k)  Proof that oil tank was properly upgraded prior to December 27, 1990, in accordance with the Regulations issued by the New York States Department of Environmental Conservation

4

15. At the Closing, seller shall deliver to purchaser a certified check to the order of the Financing Administrator for the amount of the Real Property Transfer Tax imposed by Title II of Chapter 46 of the Administrative Code of the City of New York and shall also deliver to purchaser the return required by said statute and the regulations issued pursuant to the authority thereof, duly executed and sworn to by seller. Purchaser agrees to sign and swear to the return and to cause the check and the return to be delivered to the to the City Register promptly after the closing.

16. Except as otherwise provided herein, the customs in respect to title closings recommended by the Real Estate Board of New York shall apply to the apportionments to be made at the closing.

17. Seller represents that it has not transferred or agreed to transfer any development or air rights pertaining to the premises, and has no knowledge of such transfer or agreement to so transfer by any former owner of the premises.

18. Seller represents that no brokerage or leasing fees, commissions or other compensation are or may become due or payable with respect to or on account of any of the leases or mortgages or any extensions or renewals thereof whether or not heretofore exercised. This paragraph shall survive the closing.

19. Seller represents that no person, firm, corporation or other entity has any right or option to acquire the premises, any portion thereof or any interest therein. This paragraph shall survive the closing.

20. Seller represents that: (a) it has the power and authority to enter into this contract and to consummate the sale provided for herein; (b) this contract is a valid and binding agreement of seller in accordance with its terms; (c) the person executing this contract on behalf of Seller has the authority to do so and the power to bind seller thereby and if seller is a corporation, the Board of directors of seller has duly authorized the execution and delivery of this contract; (d) neither the execution of this Contract nor consummation of the transaction contemplated hereunder requires the consent of the shareholders of seller or of any other person, firm, corporation nor will either constitute a violation or breach by seller of its Certificate of Incorporation or its by-laws or of any agreement to which seller is a party. This paragraph shall survive the closing.

21. In connection with any capital improvement or J51 application and or any MCI application, seller shall deliver, if any such applications were made and are in Seller's possession, the original of contracts, copies of bills and original cancelled checks and shall assign any guarantees and the MCI proceedings, seller shall cooperate fully with purchaser and execute any and all documents requested by purchaser.

22. If applicable, Seller shall obtain a final water meter reading for the closing and shall escrow with title company an amount sufficient for title company to omit and DEP frontage reconciliation.

1. Seller covenants that it will not, prior to the Closing:

(a) Make any change in the present use of the Premises.

(b) Generate, store or dispose of Hazardous Materials on or from the Premises nor allow other to do so.

2. Seller further covenants, pending Closing, that it will:

(a)    Comply with all environmental laws.

(b)    Allow Purchaser and its agents reasonable access to the Premises for purposes of ascertaining site conditions and for inspection of the Premises prior to Closing.

23.    Purchaser may assign this Contract provided the Assignee executes an Assumption Agreement agreeing to be bound by all of the terms of this Contract, and Purchaser shall have no further responsibility under the Contract.

24.    Seller represents there are no UBO orders or proceedings, and if there are any, Seller shall comply with same and have same removed of record prior to Closing at Seller's sole cost and expense.

25.    Seller represents that there have been no relocation proceedings or relocation liens, and if any, Seller shall remove same, of record, at Seller's sole cost and expense prior to Closing.

26.    Seller represents that there are no HPD agreements or proceedings pending and that there will be none at the closing. If there are any HPD agreements or proceedings, then Seller shall remove same of Seller's sole cost and expenses prior to closing.

27.    Seller shall maintain fire insurance from the date of contract signing to and including the date of closing. If Seller fails to maintain such fire insurance, then the Purchaser may, but shall not be obligated to, obtain such insurance and the Seller shall reimburse the cost of such insurance to the Purchaser at closing.

28.    Seller shall not settle any landlord/tenant proceeding which will materially adversely affect Purchaser after the closing of title without the Purchaser's prior written consent which consent shall not be unreasonably withheld or delayed this paragraph shall survive delivery of the Deed.

29.    If there is a stipulation of settlement with any tenant, the Seller shall comply with all landlord's obligations under the stipulation prior to the closing or allow to the Purchaser credit for the cost to comply any items which are incomplete at the time of closing. This paragraph shall survive delivery of the deed.

30.    If any work, material or labor has been performed or supplied to the Premises with the consent, permission or direction of Seller and a mechanic's lien is filed on the Premises within eight (8) months after the date of closing, the Seller shall pay or have discharged the mechanic's lien of record at Seller's sole cost and expense and shall defend, indemnify and save harmless the Purchaser from any claims, costs and expenses including reasonable legal fees incurred in connection with such mechanic's lien. This paragraph shall survive delivery of the deed.

31.    In the event the leases at closing are not in full force and effect and/or the rent being paid by the tenant twenty (20%) percent or less then on the rent roll as of the date of the signing of the contract, Purchaser may cancel this contract and receive back the deposit made on account of the purchase price.

32.    Ten (10) days after the date of contract signing Seller shall request its insurance broker to deliver three (3) to five (5) year insurance loss runs for the property.

Seller:
1551 St. Nicholas LLC
Dino Duani

By: Johour Duani

ATTY in Foct

6

Purchaser:  Real estate Services ,
Milbank ~~Realty Service~~, Inc.



By: _____

7